609 A.2d 604

EAST MANCHESTER TOWNSHIP
ZONING HEARING BOARD

v.

Craig E. DALLMEYER and East Manchester Township.

Appeal of Craig E. DALLMEYER, Appellant.

Craig E. DALLMEYER, Appellant,

v.

ZONING HEARING BOARD OF EAST MANCHESTER
TOWNSHIP, Appellee.

Commonwealth Court of Pennsylvania.

Argued April 6, 1992.

Decided May 7, 1992.

As Amended On Grant of Application for
Clarification July 17, 1992.

672

Gavin W. Markey, for appellant.

William H. Poole, Jr., for appellee.

Before PALLADINO and PELLEGRINI, JJ., and SILVESTRI, Senior Judge.

PELLEGRINI, Judge.

Craig E. Dallmeyer (Developer) appeals from two separate Orders of the York County Court of Common Pleas (trial court), one affirming the Decision of the Zoning Hearing Board of East Manchester Township (Zoning Board) denying Developer's first request for a special exception to expand his existing mobile home park by 160 lots, (2080 C.D.1991), and a second Order finding that Developer's subsequent request for a special exception to expand his existing mobile home park by 87 lots was not "deemed" approved by the Zoning Board's action in continuing the hearing, (2079 C.D.1991).

Developer is the owner of a 54.8 acre parcel of land located in East Manchester Township (Township), York County, Pennsylvania. The subject property is located in a R–1 residential zone, which at the time, permitted mobile home parks by special exception pursuant to Section 4.1.4.10 of the Township's Zoning Ordinance (Ordinance).[1] Developer also owns the adjoining Starview Mobile Home Park (Starview), which lies just south of the subject property.

---

1. The Township has since removed this special exception from the Ordinance and applicants must now proceed to obtain a use variance.

On March 14, 1989, Developer submitted an application for a special exception to expand his mobile home park to include an additional 160 lots covering the entire vacant parcel. On July 6, 1989, following a series of extensive hearings, the Zoning Board denied Developer's request for a special exception. The Zoning Board ruled that Developer had failed in his burden of proving that his proposal satisfied the criteria necessary under the Ordinance for the grant of a special exception.

Developer appealed the Zoning Board's decision to the trial court which affirmed. The trial court found that Developer failed to satisfy the specific criteria that the park provide a continuing supply of safe and potable water and failed to rebut the substantial evidence presented by the objectors that the proposed expansion would adversely affect the health, safety and welfare of the community. Developer then filed an appeal with this Court which is docketed at 2080 C.D.1991.

On July 11, 1989, less than a week after the Zoning Board had denied his first request, Developer filed a second application for a special exception, this time to expand his mobile home park by only 87 lots covering about half of the vacant parcel. On August 30, 1989, the Zoning Board convened for a hearing on this request. According to Developer, the Zoning Board began to discuss both the particulars of this application and the possibility that a continuance of the hearing would result in a "deemed" decision in Developer's favor. Following this discussion, the Zoning Board decided to continue the hearing.

On September 9, 1989, the Zoning Board issued what was termed an "Interim Administrative Ruling" which stated:

Hearing on the application to be continued to one year from this day's date or in the alternative to one of three dates, whichever is the soonest: (1) within 30 days from the withdrawal of the appeal by applicant from the denial of his alternative [160 lot] development plan, or (2) in a expeditious and timely fashion following final disposition of the appeal by applicant from the denial of his alterna-

tive development plan, or (3) at such date as directed by a court of competent jurisdiction.

(42a–43a).[2]

On October 16, 1989, Developer sent a letter to the Zoning Board requesting that they grant the special exception and provide public notice. Developer contended that because the Interim Administrative Ruling did not constitute a written decision and 45 days had passed since the hearing was continued, his second application for 87 lots is "deemed approved" pursuant to Section 908(9) of the Pennsylvania Municipalities Planning Code (MPC).[3] The Zoning Board refused to grant Developer the special exception or provide public notice.

On November 4, 1989, Developer informed the Zoning Board that he would proceed to publicly advertise his alleged deemed decision in the legal notices of two local newspapers and would also provide direct notice to the adjoining landowners. On November 15, 1989, the Zoning Board filed an appeal with the trial court in which the Township intervened.[4] The trial court held that the Zoning

**2.** The numbers in these parentheses refer to the Reproduced Record for the appeal docketed at 2079 C.D.1991. All other numbers will refer to the Reproduced Record for the appeal docketed at 2080 C.D.1991.

**3.** Act of July 31, 1968, P.L. 566, *as amended*, 53 P.S. § 10908(9). This section provides in relevant part that:
 (9) The [zoning] board or the hearing officer, as the case may be, *shall render a written decision* or, when no decision is called for, make written findings on the application within *45 days after the last hearing before the board* or hearing officer.... Where the board fails to render the decision within the period required by this subsection, ..., the decision shall be *deemed to have been rendered in favor of the applicant* unless the applicant has agreed in writing or on the record to an extension of time. When a decision has been rendered in favor of the applicant because of failure of the board to meet or render a decision as hereinabove provided, *the board shall give public notice of said decision* within ten days from the last day it could have met to render a decision in the same manner as provided in subsection (1) of this section.
 53 P.S. § 10908(9). (Emphasis added.)

**4.** Developer had filed an appeal from the Zoning Board's decision to continue the hearings but withdrew it pursuant to an agreement between the parties following the Zoning Board's appeal.

Board's actions in continuing the hearing on Developer's second request for a special exception was proper and did not result in a deemed decision. Developer then filed an appeal of this Order which is docketed at 2079 C.D.1991.[5]

The Zoning Board, in its Findings of Fact, found that Developer had satisfied all of the specific enunciated criteria under Section 18.14 of the Ordinance,[6] except for Section 18.14.7.1 which provides:

> *Water Distribution.* All mobile Home Parks shall provide to each separate mobile home lot line a *continuing supply of safe and potable water as approved by the Department of Environmental Resources.*

(Supplemental Record 3b–4b) (Emphasis added.)

Specifically, the Zoning Board found that Developer did not meet this criteria because he "has shown only the *current capacity* to provide an *ample and adequate* source of safe and potable water to each of the 160 separate mobile home lot lines in the proposed mobile home park expansion." (Emphasis added.) (Finding of Fact (F.F.) #19; 378a). The Zoning Board concluded that Developer's application must be rejected because of:

> 1. The *question of the continuance* of a safe and potable water supply and the impact of the park's water use on the surrounding land owners.

(381a) (Emphasis added.)

◼ Initially, Developer contends that the Zoning Board is precluded from rejecting his application because he failed to satisfy Section 8.14.7.1 of the Ordinance relating to a continuous supply of safe and potable water. This require-

---

**5.** Our scope of review where the trial court does not take additional evidence is limited to whether the Zoning Board committed a manifest abuse of discretion or an error of law. *Valley View Civic Association v. Zoning Board of Adjustment,* 501 Pa. 550, 462 A.2d 637 (1983).

**6.** Developer presented the testimony of Jerry T. Stahlman, a registered professional engineer, who testified as to compliance with the Ordinance's Lot Requirements, Sections 8.14.3.1–4. Stahlman testified Developer could place as many as 408 mobile homes on the 54.8 acre parcel and still meet the lot requirements of the Ordinance, but is only requesting 160. (14a).

ment, he contends, is not part of the zoning approval process, but to be addressed by other approvals obtained before the occupancy permit is issued. Developer argues that this Court recently held in *Schatz v. New Britain Township Zoning Hearing Board of Adjustment*, 141 Pa.Commonwealth Ct. 525, 596 A.2d 294 (1991), that water supply issues are to be addressed further along in the permitting and approval process and not by the Zoning Board. Developer further argues that if this is a proper criteria, the evidence presented demonstrates that his proposal satisfies this requirement.

In *Schatz*, we held that the zoning board cannot reject an application as not being in the best interests of the community because the application for the special exception did not address the issues of adequate sewage capacity, storm water management or water supply requirements. We stated that "[s]uch issues are to be addressed further along in the permitting and approval process. Zoning only regulates the *use* of land and not the particulars of development and construction." *Schatz*, 141 Pa.Commonwealth Ct. at 532, 596 A.2d at 298. (Emphasis in original.)

The Township contends, however, that the present situation is distinguishable from *Schatz* because the Township's Ordinance, unlike the ordinance in *Schatz*, contains a specific requirement concerning water distribution. The Township argues that it was proper for the Zoning Board to consider this issue because this requirement is specific in the Ordinance citing this Court's decision in *Abbey v. Zoning Hearing Board*, 126 Pa.Commonwealth Ct. 235, 559 A.2d 107 (1989).

In *Abbey*, this Court held that the fact that the Department of Environmental Resources (DER) would have to issue a permit for a waste-to-energy plant did not preclude objectors to the application for a special exception to introduce evidence that the proposed use would be detrimental to the communities health, safety and welfare. We stated that:

The fact that a facility will most likely be permitted by the DER, does not preclude objectors from introducing testimony that in a particular zoning district, the use, in their opinion, is contrary to the health, safety and welfare of the neighborhood. The grant of a permit by the DER is not tantamount to a zoning permit. To hold otherwise, would undercut the purpose of the zoning board in reviewing whether a proposed use would be contrary to *a particular zoning district's citizens' health, safety and welfare.*

*Abbey,* 126 Pa.Commonwealth Ct. at 243, 559 A.2d at 111. (Emphasis in Original.)

█ Together, *Schatz* and *Abbey* hold that while the zoning board is not precluded from considering the adequacy of potable water as it relates to the health, safety and welfare of the community, *Abbey,* the zoning board may not consider whether such a system would be permitted by another governmental entity which must grant a permit at the time of installation, *Schatz.* Here, the Township's requirement that all mobile homes be supplied with a "continuing supply of safe and potable water as approved by the [DER]" is permissible insofar as the Zoning Board only considers whether the applicant can supply sufficient potable water to the proposed development. The Zoning Board may not consider whether the applicant's plan for a water system meets the criteria of the DER for a permit for such a system.

To establish that the proposed development would be supplied with potable water, Developer presented the testimony of Jerry T. Stahlman, a registered professional engineer. Stahlman testified that the water system for the expansion will tie in with the existing system at Starview. (26a). He testified that the existing system is a public water system as defined by the DER and is approved by, and meets all the requirements of, the DER. (23a, 25a, 147a).

To calculate the needed potable water for the expansion, Stahlman testified that he relied on the DER public water

supply manual which states that when calculating required water flow, you can use past usage as your guide. (151a–52a). Stahlman stated that the average water use at Starview, the existing park with 239 units, is 33,000 gallons a day or 23 gallons a minute. (23a). He testified that the existing system is served by a well which has a capacity of 55 gallons a minute generating 79,200 gallons per day. (23a, 150a). Stahlman further stated that there exists two separate storage facilities with a total capacity of 123,000 gallons.[7] (23a, 148a, 150a). This capacity gave the existing park a 3 day water supply when the DER recommends only a 1 day supply. (149a). Stahlman further testified that the existing pumping facility is capable of pumping water at a rate of 90 gallons a minute, 130,000 gallons a day, when it draws from both the well and the storage facilities. (150a).

Stahlman then testified that the *combined* water need for the existing park and the proposed expansion would be 33 gallons a minute, or roughly 48,000 gallons a day. Because the existing source has a capacity to generate 55 gallons a minute and 79,200 gallons a day, and the existence of a large storage capacity, Stahlman stated that there is sufficient potable water to provide a continuing supply to both the existing park and the entire expansion. (23a, 57a, 153a).

To counter Stahlman's testimony, the objectors introduced the testimony of John Klinedinst, a registered professional engineer, who testified that that he agreed with Stahlman that the existing park uses 33,000 gallons a day using a source capable of providing 55 gallons per minute. (86a, 89a). However, Klinedinst differed with Stahlman as to the number of gallons per minute needed for the 160 unit expansion. Rather then rely on past usage of the existing park as did Stahlman, Klinedinst used a figure of 250 gallons per day per unit which he stated is recognized by the DER as the water use for a typical mobile home. (86a). Using this figure, Klinedinst found that the expansion

7. Stahlman also testified that Developer was planning to install another storage tower at a higher elevation in the new development which would have a capacity of 10,000 gallons and provide greater water pressure and gallons per minute. (24a, 148a).

would need an additional 40,000 gallons a day for a total of 73,000 gallons, or a flow of roughly 51 gallons a minute, to supply both the existing park and the expansion with potable water. (86a).

As to the supply of safe and potable water, both experts agree that the existing source can provide both the required gallons per minute and the storage capacity to supply the proposed development with drinking water because both Stahlman's projection of 48,000 gallons per day and Klinedinst's 73,000 gallons are below the agreed 79,200 gallon output of the source. The Zoning Board's finding that Developer failed to satisfy the requirement of a continuing supply of safe and potable water arises from Klinedinst's testimony that the water system needs to generate an additional 250 gallons a minute for a period of two hours, or 30,000 gallons, for fire protection. (88a). While Developer's water storage capacity of 123,000 gallons was sufficient to meet the needs of fire protection, the system did not generate the pressure needed to produce the flow of 302 gallons per minute Klinedinst testified is necessary for fire fighting purposes.

Section 8.14.7.1, however, only requires a continuing supply of safe and *potable* water, not water for fire protection.[8] Section 603.1 of the MPC provides that where doubt exists as to the intended meaning of the language written and enacted by the governing body restricting the use of land, it must be interpreted in favor of the property owner and against the implied extension of the restriction. 53 P.S. 10603.1. Since the Ordinance specifies only safe and potable water, the plain language of this section cannot be construed to implicitly extend to include water for fire protection.

The Zoning Board also denied Developer's request for a special exception based on its finding that the requested use "is not reasonable and appropriate for the zone in which it

8. Moreover, the Zoning Board members concede that fire hydrants are not required under the Ordinance for a mobile home park. (45a, 173a).

lies and may create a traffic hazard or otherwise impair the value, health, welfare, or convenience of the surrounding neighborhood or prospective occupants." (F.F. #34; 380a–81a). The Zoning Board stated that it was against the health, safety and welfare of the community because:

2. *Capacity versus needs* in regard to fire fighting and the safety implications to the community.

3. Slope of cuts and fills for impoundments and hazards that *might result* from that slope and altering of the general make-up of the land to accommodate 160 units.

4. Traffic safety, specifically due to heavily loaded clay trucks passing by a high density residential area, *while although not brought out in testimony* is a fact the Board cannot discount.

(382a) (Emphasis added.)

Developer contends that the Zoning Board committed an error of law when it denied his application based on needs of fire fighting, hazards regarding the slopes and traffic safety. Developer argues that there is a presumption that the mobile home park is not a threat to the health, safety and welfare of the public, and that the objectors have failed to satisfy their burden of showing otherwise.

The Township contends that the objectors provided substantial evidence to support the Zoning Board's denial of the special exception due to inadequate fire fighting capacity and safety implications on the community, to hazards resulting from the slope of cuts and fills for impoundments and to concerns over traffic safety.

██ A special exception is not an exception to the zoning ordinance, but rather a use to which the applicant is entitled unless the zoning board determines, according to the standards set forth in the ordinance, that the proposed use would adversely affect the community. *Manor Healthcare v. Lower Moreland Township Zoning Hearing Board,* 139 Pa.Commonwealth Ct. 206, 590 A.2d 65 (1991); *Johnson v. North Strabane Township,* 119 Pa.Commonwealth Ct. 260,

546 A.2d 1334 (1988), *petition for allowance of appeal denied*, 521 Pa. 625, 557 A.2d 727 (1989).

■ Once the applicant has met his or her burden of proving that the proposed use meets the specific and objective requirements for a special exception under the zoning ordinance, a presumption arises that it is consistent with the health, safety and welfare of the community. *Manor Healthcare; Appeal of R.C. Maxwell Company*, 120 Pa.Commonwealth Ct. 251, 548 A.2d 1300 (1988).

■ The burden then shifts to the objectors of the application to present evidence and persuade the zoning board that the proposed use would have a generally detrimental effect on public health, safety and welfare or will conflict with the expressions of general policy contained in the ordinance. *Manor Healthcare; Ralph & Joanne's v. Nashannock Township Zoning Hearing Board*, 121 Pa.Commonwealth Ct. 83, 550 A.2d 586 (1988). This shift occurs because it is presumed that in considering a particular use for a particular zoning district, such general matters as health, safety and general welfare and the general intent of the zoning ordinance have been considered by the Township when it provided for a special exception for the proposed use. *Schatz; Appeal of Baird*, 113 Pa.Commonwealth Ct. 637, 537 A.2d 976 (1988), *petition for allowance of appeal denied*, 521 Pa. 613, 557 A.2d 344 (1989).

■ The burden placed on the objectors is a heavy one. They cannot meet their burden by merely speculating as to possible harm, but instead must show a high degree of probability that the proposed use will substantially affect the health and safety of the community. *Manor Healthcare; Tuckfelt v. Zoning Board of Adjustment*, 80 Pa.Commonwealth Ct. 496, 471 A.2d 1311 (1984).

■ Water capacity for fire fighting, hazards resulting from slope of cuts and traffic hazards must be considered under the auspice of the general health and safety of the community because such requirements are not specifically contained in the Ordinance. Therefore, a presumption ex-

ists that a mobile home park will be sufficiently protected by the local fire fighters in the event of a fire, that the terrain on which it stands is not hazardous and that no hazards will be created by its traffic flow. The burden is on the objectors to show that the proposed expansion is not healthy or safe for the community.

■ On the issue of fire fighting capabilities, the objectors offered the testimony of Mr. Klinedinst, the engineer who testified about water capacity. As previously stated, Klinedinst testified that the water capacity of the existing source was not sufficient for fire fighting purposes and that the slope of some of the streets in the expansion may have an affect on the capacity to accommodate fire vehicles. (89a). The two fire fighters that testified agreed that the water pressure of the existing system was insufficient to fight a fire with the "blitz" type of attack used to fight such fires. (247a–50a). However, because fire hydrants are not required in a mobile home park as previously stated, water pressure to fight fires with is not a item of consideration for the Zoning Board.[9] (45a, 173a).

Moreover, although the fire fighters who testified on behalf of the objectors stated that they needed more water pressure to fight a structure fire then the current system could provide and they would probably have to run hose to a hydrant on an adjacent street, they also stated that they could handle any situation that would arise up at the park. (248a).

■ In regard to the issue of hazards from slope cuts, the Zoning Board, in its Findings of Fact, found that expansion area has "well drained soil and a terrain profile that will render the site geologically suitable for the purpose intended, [and] that an approximate two-acre portion of the site having terrain slopes of 25% or more has been

9. In its Findings of Fact, the Zoning Board found that despite no requirement that Developer install a fire hydrant in the mobile home park, Developer will install one fire alarm box at a central location within the expansion and one fire hydrant to pump water from the water storage reservoir. (F.F. #28; 379a).

set aside for open area." (F.F. # 1; 375a). Moreover, the Zoning Board found that Developer "has made design provisions so that all lots in the proposed park expansion shall be well drained and graded to a point where mobile homes may be parked so that the parking thereof shall result in the *safety of all concerned.*" (F.F. # 7; 376a) (Emphasis added.)

These Findings contradict with the Zoning Board's conclusion which speaks of "hazards that *might result* from that slope ..." (382a) (Emphasis added.) This conclusion is not only in contradiction with the facts as the Zoning Board found them, but is of such a speculative nature that it fails to demonstrate that high probability necessary to support a denial of a special exception based on the safety of the community.

 As to the issue of whether traffic hazards will result from the expansion of the mobile home park, the Zoning Board, by its own Findings and Conclusion, demonstrate that substantial evidence does not exist to overcome the presumption that the traffic generated by the mobile home park will not threaten the safety of the community. The evidence relied upon is either speculative or not contained in the record.

The Zoning Board's own Findings of Fact state that although "the three access streets and the locations thereof have been designed to minimize congestion and hazards at the entrance and exists thereof and to allow for movement of traffic on adjacent streets," the proposed expansion "*may* create a traffic hazard." (F.F. #'s 13 & 34; 377a–81a) (Emphasis added.) Moreover, in its Conclusion, the Zoning Board states that it rejects the special exception due to concerns about traffic safety even though the evidence concerning a hazard resulting from heavily loaded clay trucks passing by the area was "not brought out in the testimony." (382a).

As to Developer's second appeal at 2079 C.D.1991 concerning his application for a special exception for an alter-

native 87 lot mobile home park expansion, we need not reach the issues raised in this appeal because it is obvious to us that if a 160 lot expansion satisfies the requirements of the Ordinance, a scaled-down version of the same expansion would also meet the requirements.

Accordingly, we will reverse the trial court's Order affirming the Zoning Board's denial of Developer's request for a special exception to construct a 160 lot expansion of his mobile home park and dismiss Developer's appeal of the trial court's Order that his second request for a 87 lot expansion was not deemed approved as moot.

### ORDER

AND NOW, this 7th day of May, 1992, the Orders of the York County Court of Common Pleas dated September 5, 1991, and before us at issue 2079 C.D.1991 and 2080 C.D. 1991 are reversed, and the cases are remanded to the trial court with instructions to remand to the Zoning Board to grant Dallmeyer special exceptions to construct an 87 lot mobile home park or a 160 lot mobile home park with directions that the uses approved under the current appeals may proceed through development on plans laid out for less than the 87 lots for 2079 C.D.1991 and 160 lots for 2080 C.D.1991.

Jurisdiction relinquished.