## 4154 Roosevelt Street, LLC v. Whitehall Township Zoning Hearing Bd.

102

C.P. of Lehigh County, no. 2010-C-0285.

*Timothy J. Siegfried,* for appellant.
*Jeffrey B. Matzkin,* for appellee.
*Christopher W. Gittinger,* for intervenor.

MCGINLEY, *J.,* December 8, 2010—Appellant, 4154 Roosevelt Street, LLC, filed a land use appeal from the Whitehall Township Zoning Hearing Board's January 5, 2010 decision which denied a special exception use from Sections 27-60(D)(6) and 27-145(M) of the zoning ordinance of Whitehall Township (zoning ordinance). The use requested a conversion from a nonconforming use as an industrial building to the nonconforming use as an apartment building and the use of parking facilities that are off-site. The board's decision also denied appellant's alternative request for variances from Sections 27-76(A), 27-74(B), 27-121(B)(6), 27-121(B)(8), 27-146(A)(18), 27-121(B)(1), 27-110(C)(3), 27-121(B)(3), 27-121(B)(2), 27-76(E)(2), 27-145(P), 27-145(R), 27-76(E)(2)(c)-(d),27-121(A)(4),27-76(E)(1)(a)(4),27-74(E)(5), and 27-76(E)(5) of the zoning ordinance regarding parking requirements, apartment density requirements, parking and apartment screening requirements, use for a multi-tenant apartment building in the R4 and R5A zoning districts, driveway location requirements, rear

and side yard setback requirements, density requirements and impervious coverage requirements for a proposed apartment use.

A public hearing was held on December 15, 2009, at which time the board rendered a verbal decision. The board's written opinion denying appellant's request was issued January 5, 2010. This appeal was taken, briefs were filed, and argument was heard on this matter.

## FACTS

The subject property is located in Whitehall Township, Lehigh County, Pennsylvania.[1] The property includes a 46,016 square foot, two-story industrial building located at 4154 Roosevelt Street, Egypt; a vacant parcel located at 4159 Roosevelt Street, Egypt; and two vacant parcels located on Truman Street, Egypt. Two parcels, including the industrial building, are located in an R5-A High Density Residential Without Apartments Zoning District. The remaining two parcels are located in the R4 Medium Density Residential Zoning District.

Appellant purchased the property in September of 2009. Appellant proposes to convert the industrial building into 54 studio apartments ranging from 445 square feet to 1,000 square feet. The proposal is for 44 studio apartments on the ground floor and 10 studio apartments on the second floor; access to the second floor is proposed to be by two stairways. Appellant further proposes to provide a laundry, gym, and courtyard with picnic tables on the site. The apartments would be

_____

1. PIN 558040402252, 558040505388, 558040606115, and 548949872258.

marketed to single people, couples and the elderly.

Prior to the current ownership, the property and building were owned by V.F. Majestic (Majestic) for its garment manufacturing business. Majestic continued its business at the property until 2008. Nicole Capobianco, director of club outfitting for Majestic, testified that during various times of year, Majestic ran three shifts, comprising of 120 -- 200 employees; 40 cars were parked on the lots during the first shift and approximately 20 cars were parked on the lots during the second and third shifts. Notes of Testimony of zoning hearing board meeting dated December 15, 2009, pp. 102-103. She further testified that the facility received daily deliveries by box truck and various other deliveries at other times of the day by UPS, FedEx, vending machine servicers and tractor trailers. N.T., pp. 103-105.

In 2007, Majestic was acquired by VF Corporation, which had recently built a state-of-the-art garment manufacturing facility in Northampton County. N.T., pp. 111. Majestic no longer had a use for the facility at the subject property and decided to sell it. Majestic marketed the property for commercial and industrial purposes from early 2008 until late 2009. N.T., pp. 105. Only one inquiry was received during that time. *Id.*

Appellant purchased the property in September 2009. At the time of purchase, appellant began to market the property by running advertisements in the *Morning Call* and in newspapers in New York and New Jersey. A sign was placed on the building and advertisements were on placemats in local diners. N.T., pp. 63-64. There have been no inquiries about the property. *Id.*

Nat Hyman, principal of the subject property, testified that the site cannot be used for any of the permitted uses pursuant to Section 27-76 of the zoning ordinances. He further testified that theoretically the property could be used for a church, daycare, municipal or indoor recreational facility, but that those uses would not be economically viable. N.T., pp. 56-59.

Joseph Genay, a real estate agent and appraiser testified that the appellant's proposed use would not change the character of the neighborhood nor would it be detrimental to the public welfare. N.T., pp. 123. Mr. Genay testified that he has seen buildings like the subject building converted into churches or church-related things and into schools, but that he does not believe it is economically feasible to convert this property into one of those uses. N.T., pp. 124-125. It is his opinion that the relief requested by appellant is necessary to develop this property to an economically viable use. N.T., pp. 125-126.

Harold Newton, an engineer, presented testimony that the proposed project would have substantially less traffic than the previous use of the property. N.T., pp. 139, 142. Mr. Newton testified that the letter from the Whitehall Township Engineer stating that the daily trip generation will add a substantial amount of traffic to the neighborhood is incorrect, and that the township engineer's calculations were based on improper assumptions. N.T., pp. 152-153.

The zoning hearing board found the testimony of the appellant and appellant's witnesses not credible. Findings of Fact 31.

Adjacent landowner, Dennis Makovsky, testified that

during the first shift of the prior manufacturing use, 12 to 15 employee cars would park in the parking lot, not the 40 cars as testified to by Ms. Capobianco. Adjacent landowners, Thomas Caffrey, Timothy Beckel, Jaems Forand, Gary Petrewski, Lee Christman, Kristin Bond, Tim Caffrey, Rubello Bertoni, MaryAnn Wimmer, Tom Reinert, Nancy Lambert, Judith Caley, and Monica Fabian, voiced objections to appellant's application, which included parking problems, traffic problems, inaccuracies in the appellant's traffic engineer's calculations, noise problems, general safety concerns, the lowering of the value of surrounding residences, and the impact on their quality of life as a result of the proposed use.

The board found the testimony of the objectors credible.

## DISCUSSION

Where the trial court does not take additional evidence, its scope of review is to determine if the zoning board committed an error of law or whether the necessary findings are supported by substantial evidence. The court will not substitute its judgment of that of the zoning board unless the board manifestly abused its discretion. *Nascone v. Ross Township Zoning Hearing Bd.*, 473 A.2d 1141 (Pa. Cmwlth. 1984); *Ramondo v. Zoning Hearing Bd.*, 434 A.2d 204 (Pa. Cmwlth. 1981). "Substantial evidence" sufficient to support a decision of the zoning board is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Lantos v. Zoning Hearing Bd.*, 621 A.2d 1208 (Pa. Cmwlth. 1993).

Further, it is well-settled that in zoning cases the board

is the fact finder with exclusive province over matters of credibility and weight to be afforded the evidence. *In re: Realen Valley Forge Greenes Assocs.*, 799 A.2d 938 (Pa. Cmwlth. 2002). The appeals court may not engage in fact finding or disturb the board's credibility determinations on appeal. *In re: Brickhouse Realty Corp.*, 789 A.2d 333 (Pa. Cmwlth. 2001). The Commonwealth Court has stated:

On review an appellate court may not substitute its interpretation of the evidence for that of the Board. Assuming the record demonstrates the existence of substantial evidence, the court is bound by the Board's findings which are the result of resolutions of credibility and conflicting testimony rather than a capricious disregard of evidence. *Snyder v. Railroad Borough*, 59 Pa. Commw. 385, 430 A.2d 339 (1984). The Board, as fact finder has the power to reject even uncontradicted testimony if the Board finds the testimony to be lacking in credibility. *George v. Zoning Hearing Board of Upper Moreland Township*, 39 Pa. Commw. 472, 396 A.2d 478. *Vanguard Cellular System, Inc. v. Zoning Hearing Bd. of Smithfield Twp.*, 568 A.2d 703 (Pa. Cmwlth. 1989).

*Special Exception Requests*

Appellant's zoning application sought a special exception to Section 27-60 D(6) and 27-145 M of the zoning ordinances of the Township of Whitehall (ordinance) regarding a conversion from nonconforming use as an industrial building to the nonconforming use as an apartment building and the use of parking facilities that are off-site.

A special exception is a "use to which the applicant is entitled unless the zoning board determines, according to the standards set forth in the ordinance, that the proposed use would adversely affect the community." *Blancett-Maddock v. Pittsburgh Zoning Bd.*, 640 A.2d 498, 500-01 (Pa. Cmwlth. 1994), citing *East Manchester Twp. v. Dallmeyer*, 609 A.2d 604 (Pa. Cmwlth. 1992).

Section 27-60 D(6) of the ordinance provides as follows:

Section 27-60. *Nonconforming uses.*

D. Nonconforming uses are further subject to the following:

(6) A nonconforming use may be continued but shall not be changed to another nonconforming use except by special exception from the zoning hearing board and when all of the following conditions are met to the satisfaction of the zoning hearing board:

(a) All of the proposed use is conducted within a building.

(b) The building cannot reasonably be modified to contain a conforming use.

(c) The proposed nonconforming use is less detrimental to its neighborhood, surroundings and the general public welfare than the use it is to replace. The zoning hearing board shall take into consideration all factors which might affect the public's interest including: traffic generated, nuisance characteristics such as emission of noise,

odor, dust and smoke, fire hazards and hours and manner of operation.

In addition, the ordinance further provides:

Section 27-45. *Special exception and conditional use submission, review and decision procedures and requirements.*

E. The zoning hearing board and commissioners shall approve any special exception or conditional use which meets all of the provisions of this chapter, and:

(1) The proposed use:

(a) Is in accord with the existing comprehensive plan and the spirit, intent and purpose of this chapter.

(b) Is in the best interests of the Township.

(c) Is suitable for the site chosen.

(d) Is designed, maintained and used so as to be in harmony with adjacent properties in the immediate vicinity.

(2) The proposed use permits the logical, efficient, safe and economic extension of public services and facilities, including but not limited to water, sewer, stormwater controls, schools, police and fire protection.

(3) The proposed use does not:

(a) Substantially increase traffic congestion on the streets.

(b) Increase the danger of fire or panic or otherwise endanger the public safety.

(c) Overcrowd the land or create an undue concentration of population.

(d) Impair an adequate supply of light and air to adjacent property.

(e) Adversely affect the comprehensive plan of the township.

(f) Unduly burden water, sewer, school, park or other public facilities.

(g) Endanger the safety of persons or property by improper location or design of facilities for ingress or egress.

(h) Otherwise adversely affect the public health, safety or general welfare.

(i) Violate any federal or state law, statute, rule, directive or regulation.

(j) Interfere or encroach upon any wetlands or floodplains.

(4) The proposed use is not:

(a) Inconsistent with the surrounding zones and uses.

(b) Detrimental to the appropriate use of adjacent property.

Lastly, section 27-145 M of the ordinance provides:

Section 27-145. *Design and construction.*

M.  Required off-street parking shall be on the same lot, parcel or tract as the principal use, or, if permitted by special exception, not to be on the same lot, parcel or tract, then within 300 feet of the principal use and within the same zoning district, provided that customers are not required to transverse an arterial road without the aid of a cross walk, tunnel or overpass. In the event that parking is allowed off-site, the applicant shall provide a legally valid lease agreement or other agreement authorizing the use of the off-site property, it being expressly understood that at such time as the lease or agreement terminates, any occupancy of the building permitted by the off-street off-site parking will either cease and desist, terminate or not be permitted until such time as the lease or agreement is revived.

First, we turn to the conditions set forth in ordinance section 27-60 D(6), and specifically that the applicant must prove that the proposed nonconforming use of an apartment building is less detrimental to the surrounding neighborhood and the general public welfare than the former nonconforming use of an industrial garment manufacturing business. The ordinance provides that the board will examine all factors which might affect the public's interest, including: traffic generated, nuisance characteristics, fire hazards and hours and manner of operation. The issue before the board was whether the proposed apartments will increase traffic to the detriment of the surrounding neighborhood.

The testimony regarding traffic included the

following:

By Mr. Gittinger:

Q. Mrs. Capobianco, for the five or six years or so that you were responsible for the property, I believe you said you had managers that were on site that reported to you.

A. Yes.

Q. How often were you on site?

A. It depends. Sometimes I was there weekly, several times in a week, sometimes every few weeks.

Q. Okay. The 50 or so employees on the first shift, did you specifically observe that, or was that something those managers would report to you?

A. Meaning did I count the employees myself?

Q. Yes.

A. We have employee records.

Q. Did you count them yourself?

A. Via an employee report.

Q. So you did count them?

A. Yes.

Q. Same would be true for the 35 employees on that second shift?

A. Yes.

Q. Would you agree with me if those 50 first shift employees were getting ready to leave and the 35 second shift employees were getting ready to arrive, that basically the most people you'd have there at one time would be around 85 people?

A. Stands to reason.

Q. And would you agree that that's less than the 108 that Mr. Hyman talked about putting in for his proposed use?

A. I would say that would be accurate.

Q. The cars you mentioned, did you actually count those 40 cars at the first shift?

A. No, I did not.

Q. How about the approximate 20 cars at the second shift?

A. I did not.

Q. Where did that information come from?

A. I know who had cars and who didn't and who rode in with whom, and I based that on what I knew from the employee listing.

Q. If those 40 cars from the first shift were just about to leave and the 20 cars from the second shift had just arrived, would you say that's about 60 cars there?

A. I would say.

Q. And would you agree that's less than 106 or 108

spaces, depending on which version Mr. Hyman talked about?

A. Certainly.

N.T., pp. 108-110.

Adjacent landowner of 27 years, Dennis Makovsky, testified that 12 to 15 employee cars would be parked in the parking lot. He further testified that even less cars were there at night. N.T., p. 166.

The board found landowner Mr. Makovsky's testimony credible and Ms. Capobianco's testimony not credible. Findings of fact 31 and 34. However, even when you compare the number of employees together at the property during a shift change, as provided by Ms. Capobianco, with the 108 maximum occupants and parking spaces as proposed by appellant, the proposal has a higher number of people on the property than its previous use. This evidence supports the conclusion that the proposal will increase traffic in the surrounding neighborhood.

In addition, the board reviewed expert information regarding traffic. Appellant's engineer, Harold Newton, concluded that the proposed apartment complex would result in a reduction in traffic. His traffic study found the previous industrial use resulted in 398 average weekday trips whereas 54 efficiency apartments would result in 215 average weekday trips. Exhibit 11, A-21; N.T., pp. 137-140. If there were 18 three-bedroom units, 10 two-bedroom units and 10 efficiency apartments there would be 331 average weekday trips. N.T., p. 137. The 398 average weekday trips from the previous industrial use was based

on 50 employees in one shift and 37 employees from a second shift. N.T., p. 137. Mr. Newton based his statistics on the number of employees at the manufacturing plant, not the number of cars that were at the property. Even though Ms. Capobianco testified that there were about 40 cars on the first shift and 20 cars on the second shift and Dennis Makovsky testified that 12 to 15 employee cars would be parked in the parking lot during the day and less at night, Mr. Newton testified that the reduction in cars does not change his opinion as to the number of trips generated. N.T., p. 149. He further testified that if all the employees walked to work, his numbers would remain the same. N.T., p. 150.

The board did not find Mr. Newton's testimony credible. Findings of Fact 31.

Township engineer, Frank J. Clark, in his letter of October 19, 2009 to the Whitehall Township Planning Commission, found that the daily trip generation is 289 trips. He further stated in his letter, "this proposal for 54 units will add a substantial amount of traffic to the neighborhood. We are also concerned with this amount of traffic attempting to access the nearest arterial-class roadway (PA 329). The intersections of Roosevelt Street and Spruce Street with PA 329 are difficult to negotiate, as gaps in PA 329 peak traffic are limited, and roadway intersection geometry is far from ideal." Exhibit A-23.

Mr. Petrewski, a resident of the neighborhood, also testified as to the potential traffic generated by the proposed apartment complex. Mr. Petrewski testified that the traffic from the proposed apartments will be more

detrimental to that of the neighborhood and surroundings than that of the prior use because of the difference in the traffic's timing. He stated:

There's been a great deal of discussion about traffic trips. What was missed in all that analysis is the fact that historically - - and the testimony supports this - - that people would come to work at 6:00 AM, they would get off at 2:30; and if an evening shift was going on, they'd be back at it at 11:00.

I happen to work an 8:00 to 5:00 job; so when I get up in the morning, I'm going out in that neighborhood at 7:30, and I'm getting home at 5:30. I have never had any problem with 40, 50 or even if there was 200 cars at the manufacturing facility. Now you're going to put, in theory, 108 new cars in the parking lots, all aligned with the schedule of the residents, okay.

That traffic analysis is useless on what was done because it doesn't factor in the time of day of that traffic. You can see that historically the number of trips in a day was 500 or 300, whatever it was, and it's going to be reduced. The point that it's missing is that the trips now are going to be at 7:30 in the morning, at 5:30 in the evening; and for anybody that lives in that neighborhood right now, we can point to the closure of the Chestnut Street bridge, the bridge traffic going up Route 329, up to the light at 145; and if you drive from Roosevelt Street up to Spruce Street, it's a nightmare getting out of that neighborhood right now. Adding another hundred cars in that neighborhood over the long term is going to create a traffic nightmare. The

trip analysis that was done by the engineer doesn't go to the point. It misses the fundamental issue about when the traffic patterns are going to occur in that neighborhood.

N.T., pp. 175-176.

The board found the objector's testimony credible. Findings of Fact 34. In accepting the credibility determinations of the board, we find that substantial evidence exists to support the conclusion that the proposed apartments will increase traffic in the community. The increase in traffic created by the proposed apartments will be more detrimental to the neighborhood, surroundings and general public welfare than the previous manufacturing facility. The board did not abuse its discretion in denying the special exceptions based solely on the traffic issue. However, we will briefly address the additional two conditions required by ordinance § 27-60(D)(6).

The second condition the applicant must prove is that the building cannot reasonably be modified to contain a conforming use. The permitted uses in the R-4 and R-5A zoning districts include: agriculture, cemeteries, churches, conservation areas, a fish and wildlife refuge, forestry, municipal uses, nature preserves, schools, single-family detached dwellings, single-family attached dwellings, single-family semi-detached dwellings and support infrastructure. Ordinance §§ 27-74(A), 27-76(A).

Mr. Hyman testified that the building cannot be reasonably modified to fit the requirements of the ordinance, but admitted that the building theoretically could be used as a church, for municipal uses, a school,

a daycare center, or an indoor recreation area. N.T., pp. 56-59. The property, however, was never marketed for church, municipal use or daycare center. N.T., p., 88. Mr. Hyman testified that although theoretically possible to use the property for those uses, he did not believe that it was economically reasonable. *Id.* Mr. Hyman did not elaborate on why the use of this building as a permitted use was not economically reasonable. He has no experience converting a building into a church, school or for municipal uses. N.T., p. 70. He has "some" experience converting a building for use as an indoor recreational facility. *Id.* The board did not find his testimony credible. Findings of Fact 31.

Similarly, Mr. Genay, a real estate agent and appraiser, testified that he has seen similar buildings converted to churches and schools, but does not believe it is economically feasible to convert this one. N.T., pp. 124-125. Again, the board did not find his testimony credible. Findings of Fact 31.

There was also testimony that the subject building could continue to be used for garment manufacturing. Mr. Hyman testified as follows:

Q.   Well, your testimony is that the building is obsolete for garment manufacturing purposes; and my question is, what basis do you have to support that conclusion?

A.   I just said that that was not my testimony. I just said it is not obsolete for garment manufacturing purposes. I said there is nobody out there to lease it to for garment manufacturing purposes.

Q. All right, okay. Just so we're clear, your position is that the building could physically continue to be used for garment manufacturing; but in your opinion, there's no renters or users out there to take advantage of that physical plan?

A. That's right.

N.T., pp. 91-92.

Ms. Capobianco collaborated by testifying as follows:

Q. Was there something wrong with this building that contributed to Majestic moving out or stopping work there in early 2008?

A. Again, Majestic was acquired by the VF Corporation in early 2007, and they had other manufacturing facilities in other parts of the country; and they also built a state-of-the-art building and absorbed that production into other facilities.

Q. But your company didn't sell the building because it was obsolete?

A. We sold the building because we had no use for it.

Q. But not because it was obsolete; you couldn't use it?

A. We could not use it.

Q. And was there anything about that building that would indicate you could not have kept that manufacturing business going there?

A. I would say no.

N.T., pp. 110-111.

Substantial evidence exists to support the finding that the property could continue in its current nonconforming use or be converted to a conforming use. The board did not abuse its discretion in finding that the appellant failed to meet the condition that the property cannot be reasonably modified to contain a conforming use.

Finally, the applicant must prove that all of the proposed use be conducted within a building. Ordinance § 27-60 D(6)(a). The board found that this requirement was not met because the proposed resident's parking would not be within the building. We do not agree with the board's interpretation of the ordinance and do not agree that the parking collateral to a nonconforming use must be physically within a building. However, this error does not change the outcome of upholding the denial of the special exception because the other two conditions were not met.

The board did not err or abuse its discretion in denying the appellant's request for special exception because appellant did not satisfy all three conditions set forth in ordinance §27-60(D)(6). Therefore, it is unnecessary for this court to address the numerous additional requirements set forth in ordinance § 27-45(E). We do point out, however, that the above discussion regarding traffic would support the board's finding that the appellant did not satisfy its burden of proving that the proposed use does not substantially increase traffic congestion in the streets or otherwise adversely affect the public health, safety or general welfare as required by ordinance § 27-45(E)(3)(a) and (h).

*Variances*

Appellant requested variances as an alternative to the special exception requests in order to use the property as an apartment complex. The variances requested include the following: (1) a variance from the permitted uses in the R5-A and R-4 zoning districts to permit a 54-unit apartment building; (2) a variance from the requirement that apartment buildings less than two and a half stories contain a maximum of 16 dwellings to permit a two-story apartment building with 54 units; (3) a variance from the requirement that apartment buildings have double side and rear yard setbacks, to permit the building, as it is presently configured, to exist without double side and rear yard setbacks; (4) a variance from the requirement that apartment buildings have a density of no more than eight dwelling units per gross acre, to permit approximately 24 units per gross acre; (5) a variance from the requirement that apartment buildings be screened from adjoining residential uses; (6) a variance from the requirement that parking areas have a minimum parking setback of 10 feet; (7) a variance from the requirement that no driveway shall be less than 50 feet from the intersection; (8) a variance from the requirement in the R-5A district to have a minimum lot area of 5,500 to permit 54 apartments to be located on a lot with 48,706.35 square feet; and (9) variances from the maximum impervious surface coverage permitted in the R-4 and R-5A zoning districts.

Several of the variances are necessary because of the existing building on the property. Specifically, the building does not provide for adequate side and rear yards to meet the minimum setback requirements; it is impossible to

provide screening between the building and the adjacent residential uses; the existing parking areas are situated so that the entrances are closer to the intersections than permitted by the ordinance; and the existing impervious coverage is in excess of what is permitted by the ordinance.

In granting a variance, the board must apply the requirements set forth in 53 P.S. §10910.2, which provides, in pertinent part:

The board may grant a variance, provided that all of the following findings are made where relevant in a given case:

(1) That there are unique physical circumstances or conditions, including irregularity, narrowness, or shallowness of lot size or shape, or exceptional topographical or other physical conditions peculiar to the particular property and that the unnecessary hardship is due to such conditions and not the circumstances or conditions generally created by the provisions of the zoning ordinance in the neighborhood or district in which the property is located.

(2) That because of such physical circumstances or conditions, there is no possibility that the property can be developed in strict conformity with the provision of the zoning ordinance and that the authorization of a variance is therefore necessary to enable the reasonable use of the property.

(3) That such unnecessary hardship has not been

created by the appellant.

(4) That the variance, if authorized, will not alter the essential character of the neighborhood or district in which the property is located, nor substantially or permanently impair the appropriate use or development of adjacent property, nor be detrimental to the public welfare.

(5) That the variance, if authorized, will represent the minimum variance that will afford relief and will represent the least modification possible of the regulation at issue.

The ordinance mirrors the requirements set forth above for a zoning variance. Ordinance § 27-42(C).

In construing the foregoing statutory law, the courts have consistently held that in order to obtain a variance, the applicant must demonstrate that the effect of the particular zoning ordinance in issue imposes an unnecessary hardship on the applicant's property; that the hardship is unique or peculiar to the applicant's property as distinguished from the impact of zoning on the entire district; that the variance, if granted, would not adversely impact on the health, safety or welfare of the general public; and that the hardship was not self-inflicted. *Solebury Twp. v. Solebury Twp. Zoning Hearing Bd.*, 914 A.2d 972 (Pa. Comwlth. 2007); *Ken-Med Assoc. v. Bd. of Twp. Supervisors*, 900 A.2d 460 (Pa. Comwlth. 2006).

The first requirement is that the zoning ordinance imposes an unnecessary hardship due to unique conditions peculiar to his property. Our courts have held that the financial impracticability of a required conversion of

a premises from a nonconforming to a conforming use can constitute a hardship. *O'Neil v. Philadelphia Zoning Board of Adjustment*, 384 Pa. 379, 384, 120 A.2d 901, 904 (1956). Property owners are not required to reconstruct a building to a conforming use regardless of the financial burden. *Halberstadt v. Borough of Nazareth*, 546 Pa. 578, 687 A.2d 371 (1997).

In *Halberstadt*, a property owner sought variances to develop a "fortress-like" building into commercial and residential space. The building was erected in 1914 and was made of brick and concrete. Because of its heavy construction it was cost prohibitive to raze and would have been very expensive to renovate. The court held that the zoning ordinance affected the property owner in a unique way because of a combination of the land's physical condition and the fortress-like building sitting upon it. *Id* at 583, 687 A.2d 373.

Similarly, the property in this case contains a 46,016 square foot industrial building that was built in 1910. We agree with the position that the industrial building could be considered a hardship unique to this property. However, unlike *Halberstadt*, the board in this case did not have credible testimony to support the contention that it is cost prohibitive to raze the building or to renovate the building to house a conforming use. In fact, as more fully described in the above special exception discussion, the board had substantial evidence to determine that the building could possibly be used for a conforming use; i.e., church, school, municipal use, daycare or indoor recreational facility. In addition, the board had evidence to find that the building could continue as a nonconforming

use as a garment manufacturing facility. There was no evidence to support the cost of any renovations necessary to either continue the building as a manufacturing facility or to renovate the building for a conforming use. Therefore, the appellant did not meet its burden in establishing that the zoning ordinance imposes an unnecessary hardship on this property. The board did not err or abuse its discretion in finding that this requirement was not met.

The second requirement for a variance is that there is no possibility that the property can be developed in strict conformity with the provision of the zoning ordinance. Once again, the testimony of Mr. Hyman and Mr. Genay contradicted this requirement. Both testified that it was possible, at least hypothetically, for this building to be used as a church, school, daycare, municipal use or indoor recreational facility. They stated that it would not be economically feasible for the building to be used for those purposes, but did not support their opinions with any further information.

The board found that appellant failed to demonstrate that the building cannot reasonably be modified to contain a conforming use. Findings of Fact 37. We have reviewed the record in this matter and find that substantial evidence supports the board's finding in that regard and that no error was made.

The board found that the appellant did not demonstrate that if the variance was granted, it would not adversely impact the health, safety or welfare of the general public. Findings of Fact 51. We again find that the record has substantial evidence to support the board's finding. In reviewing the special exception request, we found that

there was substantial evidence for the board to find that the proposed apartment building was more detrimental to the surrounding neighborhood than the former industrial garment manufacturing business because of the increase in traffic. It is the same increase in traffic that supports the board's finding that the appellant did not demonstrate that the proposed variance would not adversely impact the public welfare. The appellant and the township had contradicting testimony on the traffic impact issue. The board made a credibility determination and found the objectors credible and the appellant and his witnesses not credible. The weight to be accorded evidence concerning requested variances is for the board. *Solow v. Zoning Hearing Board*, 440 A.2d 683 (Pa. Cmwlth. 1982).

Finally, the last requirement is that the variance will represent the minimum variance that will afford relief and will represent the least modification possible of the regulation at issue.

As discussed above, there was substantial evidence for the board to find that the appellant failed to establish that there is no possibility of developing the property in strict conformity with the ordinance. Logically, such a use would require the least modification possible. However, even assuming a residential use would be appropriate, the testimony is unconvincing that the proposed use represents the minimum variance that affords relief.

Mr. Hyman testified as follows:

Q. Now, you indicated in response to Mr. Siegfried's questions that you're asking in terms of a variance, you're asking for the minimum relief possible, is

that fair to say?

A. Yes.

Q. You didn't give a rationale for your affirmative response to that question, though. Why do you think you're asking for the minimum relief that's required here?

A. Well, I'm not aware of any other relief which will meet - - well, let me rephrase. I'm not aware of any other relief that will allow this building to be commercially viable.

Q. Well, you're asking for 54 units, correct?

A. Correct.

Q. And is there some reason you can't propose less than 54 units?

A. I could propose less than 54 units, but then the entire building would not be utilized because even at the size they are now, if you get much bigger than that, then the utility cost to heat those units becomes prohibitive.

Q. So it's an economic consideration?

A. It is.

Q. You could propose less units, but it would be more expensive, fair to say?

A. I don't understand the question.

Q. Well, you could possibly develop this property for

less than 54 units. I think we can agree on that.

A. Yes.

Q. You've made a financial decision that it's in your best financial interest to develop it for 54 rather than less units?

A. That's right.

N.T., pp. 92-93.

Mr. Hyman relies solely on his financial interest in attempting to establish that appellant's relief is the minimum variance that will afford relief and will represent the least modification possible of the regulation. The board did not find his testimony credible. Findings of Fact 31. Accordingly, the appellant did not satisfy the last requirement necessary for the approval of variances.

We have carefully reviewed the record and find the evidence regarding the variance requests sparse. We find that the board applied the correct law in examining the variance requests; and, further, that the board did not abuse its discretion in finding that the appellant failed to meet the requirements.

Accordingly, the board's opinion denying appellant's request for special exceptions or in the alternative, variances, dated January 5, 2010, is affirmed.